Eric H. Horn
Maria A.G. Harper
**A.Y. STRAUSS LLC**
290 West Mount Pleasant Avenue, Suite 3260
Livingston, New Jersey 07039
Tel: 973-287-0966
Fax: 973 -533-0127

-and-

Wendy J. Lindstrom
Laura D. Castner
**MAZZOLA LINDSTROM LLP**
1350 Avenue of the Americas, 2nd Floor
New York, New York 10019
Tel: 646-216-8300

*Counsel for the Plaintiffs*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>Lisa Schiff,<br><br>               Debtor. | Chapter 7<br><br>Case No. 24-10010−dsj |
| Candace Carmel Barasch, Michael A. Barasch, Bradley A. Carmel Living Trust, Richard Grossman, Lauren Geller, and Hangman NYC, LLC,<br><br>               Plaintiffs,<br><br>v.<br><br>Lisa Schiff,<br><br>               Defendant. | Chapter 7<br><br>Adversary Proceeding No. 24- |

**COMPLAINT FOR DETERMINATION THAT DEBT IS NONDISCHARGEABLE**

Candace Carmel Barasch ("**Candace**"), Michael A. Barasch ("**Michael**"), Bradley A. Carmel Living Trust (the "**Trust**" and together with Candace and Michael, the "**Barasch Parties**"), Richard Grossman ("**Grossman**"), Lauren Geller ("**Geller**"), and Hangman NYC, LLC ("**Hangman**," and together with the Barasch Parties, Grossman and Geller, the "**Plaintiffs**"), as Plaintiffs in the above-captioned adversary proceeding, hereby allege, upon their own knowledge or upon information and belief as follows:

## PRELIMINARY STATEMENT

1.      By this adversary proceeding, Plaintiffs are seeking a declaratory judgement against Lisa Schiff (the "**Debtor**" or "**Schiff**") finding that Plaintiffs' claims against the Debtor amounting to over $6,650,000 are nondischargeable pursuant to 11 U.S.C. §§ 523(a)(2), 523(a)(4), 523(a)(6), and 727(a)(2)(A).

2.      Lisa Schiff's fraud is well documented.  Schiff used her status as a friend and art advisor to Plaintiffs to steal monies from Plaintiffs.  Schiff stole these monies for the simple reason that, despite "earning" seven figures per year from her apparently successful art advisory business, Schiff Fine Art LLC (**"SFA"**), she wanted an even more extravagant lifestyle that she simply could not afford.  As set forth below, her theft from Plaintiffs allowed Schiff to rent an apartment for $25,000 per month, spend $2,000,000 renovating a rented space that was entirely unnecessary for her business, go on European shopping sprees at designer boutiques, for handbags, clothes and jewelry, and travel the globe staying at the finest hotels, even renting a Greek villa, yacht and helicopter for vacation and transportation.  All of this was funded with stolen monies.

3.      To make matters worse, Schiff pretended to be the Barasch Parties' and Grossman's friend – even going as far to say and act as if she considered them her and her son's family, and repeatedly telling them she loved them.  What Plaintiffs did not know, however, and what Schiff

never revealed until she had disposed of the funds they entrusted her with to for purchases and from sales of artworks, is that – apparently for years – Schiff had cultivated and taken advantage of the position of trust she held with Plaintiffs, so that she could take advantage of Plaintiffs and use their funds as her personal piggy bank.

4.     At bottom, Schiff is a fraud and nothing more than a common thief.  Her actions hurt many people – the Barasch Parties and Grossman most of all, and she certainly should not be permitted to discharge her debts to Plaintiffs for the monies she stole from them. To allow this would be a travesty of justice and reward a committed fraudster for her most egregious actions.

5.     Accordingly, Plaintiffs bring this adversary proceeding to thwart Schiff's attempts to discharge her debts to Plaintiffs for the monies that she stole from them.

## JURISDICTION AND VENUE

6.     This Court (the "***Bankruptcy Court***") has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b).  Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.

7.     The statutory and legal predicates for the relief requested herein are 11 U.S.C. §§ 523 and 727, and rules 4007 and 7001 of the Federal Rules of Bankruptcy Procedure.

8.     Plaintiffs consent to entry of a final order or judgment by the Bankruptcy Court in this matter.

## PARTIES

9.     Plaintiff Candace Carmel Barasch is and at all times material hereto has been a resident of New York, New York, and the wife of Plaintiff Michael A. Barasch.

10.    Plaintiff Michael A. Barasch is and all times material hereto has been a resident of New York, New York, and the husband of Plaintiff Candace Carmel Barasch.

3

11.     Plaintiff the Bradley A. Carmel Living Trust is a trust established by Candace Carmel Barasch and Michael A. Barasch for the benefit of their children, and particularly for their children's college tuition, fees and expenses. Candace is the trustee of the Trust and empowered to act for and on behalf of the Trust.

12.     Plaintiff Richard Grossman is and at all times material hereto has been a resident of New York, New York.  Plaintiff Grossman's spouse, who is and at all times material hereto has been a resident of New York, New York, has assigned all rights relating to this action to Richard Grossman.

13.     Plaintiff Lauren Geller is and at all times material hereto has been a resident of New York, New York.

14.     Plaintiff Hangman NYC, LLC is and at all times material hereto has been a New York limited liability company with its principal place of business in New York, New York.

15.     Defendant Lisa Schiff is and at all times material hereto has been or was a resident of New York, New York, working as an art advisor, and is the chapter 7 debtor herein.  Schiff is the principal of Schiff Fine Art LLC, through which she conducted her art advisory business.  Upon information and belief, Schiff is the sole member and owner of SFA.

## PROCEDURAL BACKGROUND

*(in chronological order)*

### A.     Candace Barasch / Richard Grossman Action

16.     On May 11, 2023, Grossman and Candace filed an action against SFA and Schiff in the Supreme Court of the State of New York, County of New York (Index No. 652287/2023) (the "***Ghenie Case").***

17.     Candace and Grossman asserted claims for breach of contract, conversion, fraud,

4

breach of fiduciary duty, and conspiracy, on account of Schiff's sale of an artwork by Adrian

Ghenie, titled *The Uncle 3* (2019), oil on canvas, 220 cm x 260 cm (the "***Ghenie Artwork***"), which

Candace and Grossman jointly owned, and for which Schiff failed to remit the full sale proceeds

of $2,500,000 to them (as described more fully below).

18.     On September 18, 2023, Schiff and SFA filed their answer wherein they invoked

their purported constitutional privileges under the Fifth Amendment of the United States

Constitution and Article 1, Section 6 of the New York State Constitution, as to each and every

allegation asserted in the complaint.

**B.     Assignment for the Benefit of Creditors**

19.     On May 15, 2023, SFA, through Schiff, executed an Assignment appointing

Douglas J. Pick as assignee ("***Pick***") to liquidate the assets of SFA for the benefit of its creditors

(the "***Assignment***").

20.     The Assignment was filed in the Office of the Clerk of New York County on or

about May 15, 2023, initiating the Assignment for the Benefit of Creditors Proceeding (Index No.

510009/2023) (the "***ABC Action***"), and assigned to Judge Billings until her retirement, when it

was transferred to Judge Ally.

**C.     Barasch Parties' Action**

21.     On May 17, 2023, the Barasch Parties filed an action against SFA and Schiff in the

Supreme Court of the State of New York, County of New York (Index No. 652380/2023) (the

***"Barasch Parties' Action"***).

22.     The Barasch Parties asserted claims for breach of contract, conversion, fraud,

breach of fiduciary duty, conspiracy, replevin, accounting, and unjust enrichment, arising from

Schiff's malfeasance with respect to additional artworks that the Barasch Parties had directed

Schiff/SFA to purchase and/or sell on their behalf, but which they discovered Schiff had never

paid for, not paid for in full, and/or had failed to remit the sale proceeds to the Barasch Parties.

23.     Schiff and SFA filed an answer on September 18, 2023 wherein they invoked their

purported constitutional privileges under the Fifth Amendment of the United States Constitution

and Article 1, Section 6 of the New York State Constitution, as to each and every allegation

asserted in the complaint.

**D.     Lisa Schiff Chapter 7 Case**

24.     On January 4, 2024 (the "***Petition Date***"), the Debtor commenced her chapter 7

case (the "***Chapter 7 Case***") by filing a voluntary petition for relief under chapter 7 of the

Bankruptcy Code in this Bankruptcy Court.

25.     Yann Geron was appointed the Chapter 7 trustee in the Chapter 7 Case.

26.     The deadline for objecting to the discharge of the Debtor's debts was April 15,

2024.

**E.     SFA's Chapter 7 Case**

27.     On January 10, 2024, three petitioning creditors, including Candace, Grossman,

and Geller, filed an involuntary petition for chapter 7 relief under the Bankruptcy Code against

SFA (Case No. 24-10039-dsj).

28.     On March 12, 2024, the Bankruptcy Court entered an order granting the chapter 7

relief [Docket No. 27].

29.     Deborah Piazza was appointed the Chapter 7 trustee in that chapter 7 case.

## RELEVANT FACTUAL BACKGROUND AND ALLEGATIONS

### A.      Barasch Parties' Relationship with Schiff and SFA

30.      Candace met Schiff almost twenty years ago in or about 2004. From the time Candace met Schiff, Schiff began acting as an art advisor for her.

31.      Acting pursuant to a continuing oral agreement, Schiff and SFA researched and recommended various works of art for Candace's and her husband's collection, for their home and for investment, including for investment by the Trust.  Schiff regularly advised Candace to sell certain works and then re-allocate the proceeds into the purchase of one or more other artworks.

32.      Virtually immediately after Schiff and Candace met, Schiff began cultivating a personal friendship with Candace which transcended their business relationship, to the point that Candace and her family considered Schiff like a member of the family.

33.      Among other things, Schiff frequently traveled with Candace and her family to attend art-related events. On these trips, Candace regularly observed Schiff spending tens of thousands of dollars at a time on couture clothing and accessories, and making jewelry purchases of $20,000 at a time. For example, in October 2022, while Candace and Schiff were traveling in Europe for the Paris+ (Art Basel) art fair, Schiff spent over 30,000 euros (approximately $32,400) at the designer store Loewe in Paris for nineteen items including, among other things, a single pair of leggings for 590 euros (approximately $573), a dress for 4.900 euros ($4,762.80), and a pair of jeans for 980 euros (about $953). Schiff told Candace that the rent on her New York apartment was about $25,000 per month, and that the rents on each of Schiff's offices in New York and London were also tens of thousands of dollars per month. Schiff also rented a luxury apartment in the legendary Colonial House Apartment complex in West Hollywood where Bette Davis once lived.

34.     Schiff also talked with Candace about the private school that her son attended, sharing with Candace that the tuition was approximately $60,000.00 per annum. Schiff relayed to friends of Candace that Schiff has put aside money from Schiff's businesses for her son, and that her son is "all set."

35.     Since 2004, Schiff cultivated a relationship of trust with the Barasch Parties, as a result of which she and / or SFA  came to manage all aspects of the Barasch Parties' art collection, from purchases and sales of artworks, to framing, installation, transportation, handling, and storage of artworks. Trust was a crucial dimension of the relationship between Schiff and the Barasch Parties.

36.     The Barasch Parties understood that Schiff / SFA often acquired artworks for her clients by directing the sellers not to invoice the Barasch Parties directly, but rather to invoice Schiff/SFA for the works, with Schiff/SFA then invoicing Schiff / SFA's clients. As a standard practice, all funds for the Barasch Parties' purchases and sales of artworks passed through Schiff / SFA's accounts, rather than directly between the Barasch Parties and the sellers or purchasers of the artworks. To facilitate these transactions, Schiff / SFA requested and received authorization to keep on file and use Candace's credit card(s) for certain transactions. In addition, Schiff / SFA were authorized to access, manage and transfer artworks in and out of storage accounts in Candace's name at a number of fine art storage facilities. Schiff also sent Candace lists of recommended artworks on which Schiff / SFA placed deposits for the Barasch Parties if Candace approved.

37.     Through Schiff's extensive dealings with the Barasch Parties, the Barasch Parties placed trust and confidence in the integrity and fidelity of Schiff and SFA. Schiff thereby gained a position of influence with the Barasch Parties, as the only art advisors with which the Barasch

Parties worked. Further, Schiff accepted and benefited from the trust and confidence that the Barasch Parties placed in Schiff, as certain galleries and artists would only give Schiff / SFA access to certain works if the works were being purchased by/for Candace and/or the Barasch Parties.

38.     In their business and personal dealings since they met, Schiff presented herself to Barasch as an ethical, sophisticated, knowledgeable, and financially successful businesswoman, and gave no hint to the Barasch Parties that Schiff / SFA were in financial distress, or that any of the business dealings in which Schiff / SFA engaged were other than aboveboard. Nor did any of Schiff's / SFA's employees, including without limitation SFA's London advisor and director, and Schiff's / SFA's independent accountant in New York, give the Barasch Parties any indication that Schiff / SFA were in any financial distress.

39.     In fact, after gallerist David Kordansky telephoned Candace in the summer of 2022 to follow up on payment that had not been made for an artwork Candace had purchased through Schiff / SFA, Schiff dismissed it as an oversight because she or her accountant were so busy. Based on information which the Barasch Parties have learned, Schiff's / SFA's failure to timely pay the Kordansky Gallery was part of their scheme to defraud their clients.

**B.     Schiff Abused the Trust Plaintiffs Placed in Her Through Her Long Friendship and Fiduciary Relationship**

40.     Starting in approximately 2004 or 2005, the Barasch Parties entered into an oral agreement with Schiff pursuant to which Schiff, through her companies, acted as the Barasch Parties' art advisor, and was compensated via commissions on artworks that the Barasch Parties purchased or sold through Schiff / SFA. The agreement continually renewed, as the Barasch Parties continued to purchase and sell artwork through Schiff / SFA, and Schiff / SFA managed the Barasch Parties' collection over the years.

9

41.     As Schiff has acknowledged in published interviews, the art world can be daunting and confusing for novices as well as experienced collectors. *See, e.g.*, https://news.artnet.com/buyers-guide/15-minutes-with-a-price-database-power-user-founder-andpresident-of-sfa-advisory-lisa-schiff-on-finding-humor-in-the-art-world-2001701 (quoting Schiff, "I think I have a knack for understanding the invisible relations that make up much of the art world and for explaining that to individuals"), and https://www.cnn.com/style/article/artadvisers-inside-the-art-buying-world/index.html (quoting Schiff, ". . . the good, the bad and the ugly – the auction houses, the galleries, the museums, the artists. Everybody has to come together to make the magic happen.").

42.     Although Candace had been navigating the art market on her own since 2000, she appreciated Schiff's experience and knowledge of the art world, including for example Schiff's background in art history, and connections with gallerists, artists, museums, vendors, and collectors (among others). The Barasch Parties hired and entrusted Schiff / SFA with growing and managing their art collections and worked with Schiff / SFA exclusively.

43.     The services Schiff / SFA provided to the Barasch Parties included, without limitation, understanding the Barasch Parties' taste and goals in collecting, finding artworks which fit these attributes, communicating with galleries, auction houses, and private sellers about works, providing special access to in-demand artworks, artists, and events, conducting due diligence such as provenance checks, and coordinating payment and transfers of funds and artworks, including organizing transportation, shipping, and storage.

44.     Eventually, Schiff / SFA's management of the Barasch Parties' collections was so complete and longstanding that the Barasch Parties came to completely rely on and trust Schiff and her entities; it never occurred to them that Schiff would steal from them. Candace spoke with

Schiff every day, several times during the day. Schiff had access to and was able to use Candace's credit card as needed for art purchases, and for payments to vendors and storage facilities. The artworks that the Barasch Parties purchased through Schiff were all bought through SFA, with SFA preparing and issuing the invoices, and payments being transmitted by the Barasch Parties to SFA's bank account at City National Bank.

45.    The Barasch Parties are serious and respected art collectors who are supporters of emerging and established artists, galleries, museums, fine art logistics companies – the entire art spectrum. Their homes have artworks from their extensive collection rotating in and out from their storage accounts at various times. Schiff / SFA managed the Barasch Parties' entire collection as a service provided from the start of their professional relationship. Schiff was the custodian of the Barasch Parties' inventory and records. With limited paperwork in their possession, it has been challenging for the Barasch Parties to account for the various artworks that they purchased through Schiff / SFA, and to determine whether the works that they purchased (or believed they purchased) through Schiff / SFA were actually paid for by Schiff / SFA and delivered to the Barasch Parties' home or art storage accounts.

46.    The Barasch Parties relied upon Schiff to ensure that purchased artworks were timely and fully paid for. To that end, when Schiff asked the Barasch Parties to wire funds for the purchase of artworks they had authorized, the Barasch Parties did so.

47.    Because all transactions and funds went through Schiff's entities, the Barasch Parties generally did not communicate directly with the artists and galleries (unless/until Candace visited them to see particular works) and would not know if something was amiss; part of Schiff's job was to handle such issues. And for more than a decade it appeared that Schiff faithfully did so – but apparently, she did not.

48.    On the morning of Monday, May 8, 2023, Schiff (who Candace spoke with every day, multiple times a day, for many years until that date) called Candace and admitted that the sale proceeds of the Ghenie painting were gone; that monies which the Barasch Parties had wired to SFA for the purchase of artworks was gone; that Schiff had dug herself into a large financial hole that she could not get out of; that this had been going on for many years; and that Schiff had considered filing for bankruptcy prior to the start of the COVID-19 pandemic, but did not do so because she was afraid of a criminal investigation. Schiff explained that she had intended to map out a plan to get herself and her entities out of this financial hole during her stay in a rehabilitation center in San Francisco, that she went to in January 2020 to treat an addiction. (She also mentioned that rehab cost over $100,000).

49.    During this same conversation, Candace asked Schiff to paint a picture of how much art the Barasch Parties had purchased through Schiff / SFA was affected by Schiff's actions. Schiff mentioned a Sarah Lucas sculpture that the Barasch Parties bought in March 2020 for $390,000 and that other works were also affected. Schiff claimed she had tried to chip away at the monies owed on artworks for the Barasch Parties where Schiff / SFA had diverted the funds elsewhere. Following up on Monday, May 8 with the Gladstone Gallery where the Lucas sculpture was located, Candace learned that the gallery had not received any money toward the sculpture, and further that the gallery was still owed $252,000 toward a Wangechi Mutu sculpture purchased in February 2020.

50.    Every day of the week before Schiff admitted her wrongdoing – at a time when she apparently knew that her scheme was about to implode – Schiff pressured the Barasch Parties to urgently wire money to Schiff / SFA, ostensibly to pay for artwork purchases that the Barasch Parties had authorized. Candace learned from Schiff on May 8, 2023 that the last two wires she

12

had sent to Schiff (from the Trust) did not go towards payment on the paintings they were earmarked for. The last transfer of $190,531.25 was made just four days before Schiff's confession. When Candace asked Schiff on May 8, 2023 where this money went, Schiff said she did not know.

51.     However, records obtained in third-party discovery in the Barasch Parties Action show that immediately after the $190,531.25 was wired into SFA's account, $190,000 was transferred to East West Bank.  The Barasch Parties were unable to obtain further information about this transfer, due to Schiff's and SFA's refusal to respond to discovery requests on Fifth Amendment grounds.  What is clear however is that at the time Schiff demanded and accepted in trust the Barasch Parties' wire of $190,531.25, she knew that her scam was crashing down and never had any intention of using it for the purposes of paying for artworks on behalf of the Barasch Parties as she represented to them.

52.     On May 8, 2023, Schiff conceded to the Barasch Parties that the money owed to them from the sale of the Ghenie painting was gone; and Candace's friend and co-owner of the Ghenie painting related that when he saw Schiff, she had admitted the same to him, told him to call Schiff's attorney, and walked away. Schiff later texted Candace's friend, acknowledging her wrongdoing:

> Did you call him
>
> I am sorry and have every intention to make things right
>
> It's just complicated
>
> I know you will never speak to me again but I will try to make it right regardless

53.     Schiff messaged Candace on May 8, 2023, after their phone call, "Know that I love you. Not able to talk but later today . . ."

13

54.     Since May 9, 2023, Schiff has apparently emailed at least seven of her other clients (but not Plaintiffs), saying that she had "fallen on incredibly hard financial times," is "indebted to you and others and am simply unable to meet my obligations;" and that her "current situation is very complicated from a legal perspective" so they should address any questions and requests for information to Schiff's attorney.

## C.     The Barasch Parties Investigate the Extent of Schiff's Fraudulent Conduct

55.     Following Schiff's confession to Candace on May 8, 2023, Candace communicated with a number of collectors and galleries who have worked with Schiff and may be affected by Schiff's / SFA's wrongdoing. In some instances, Candace reached out to gallerists about the payment status of works that Schiff / SFA had recently arranged for the Barasch Parties to purchase, and for which the Barasch Parties had wired funds to Schiff / SFA. In other instances, after news of the Ghenie Case spread, gallerists reached out to Candace about works that Schiff / SFA bought for the Barasch Parties but had not paid for.

56.     As to the Ghenie painting, Sotheby's confirmed that the painting was sold for $2.5 million (as Schiff had represented to Plaintiffs), all of which was paid to SFA – contrary to Schiff's misrepresentations to Plaintiffs that the buyers needed more time to make installment payments for the work. Sotheby's first remitted an initial payment of $810,000.00 to SFA on December 16, 2022, and then remitted the balance of $1,690,000.00 to SFA on January 17, 2023.  Schiff did not tell the Barasch Parties about Sotheby's December 2022 payment to SFA and remitted nothing to Candace and the co-owners of the Ghenie from that payment. After SFA received Sotheby's January 17, 2023 payment, Schiff took a commission of $250,000 and distributed $225,000 to Candace and $225,000 to the co-owners of the Ghenie painting (including Grossman) on or about January 18, 2023 – a total of $700,000 from the $2,500,000 sale proceeds. Schiff / SFA made no

14

further payments, leaving $1.8 million of Candace's and the co-owners' money in Schiff's / SFA's hands. Upon information and belief, Schiff used this money for her own personal benefit and enjoyment, and/or to pay for art purchased by other clients, and/or to pay other obligations of Schiff / SFA.

57.    With the exception of the artworks that were destined for storage in Delaware, Schiff / SFA always charged and the Barasch Parties always paid sales tax appropriate for the state where the art was being delivered. Since many of the artworks were never actually purchased by Schiff / SFA, the Barasch Parties have also lost the sales tax that they paid on the artworks destined for their homes (or storage facilities) in New York, Connecticut and Florida.

58.    Candace acquired a sculpture by Nicholas Party, *Large Cat* (2018) (bronze, 657 pounds); it appears in at least one catalog of Candace's artworks that was prepared by SFA, dated in or about July 2020.  Candace bought the work from Xavier Hufkens Gallery in Belgium through SFA in or about November 2019, and paid to ship it from Hong Kong to the U.S.  Candace subsequently learned that Schiff / SFA remitted Candace's payment to the Gallery.  However, the sculpture never left China (where the foundry used to produce it is located). The Xavier Hufkens Gallery subsequently bought it back from SFA / Schiff, at a profit to SFA/Schiff, without Candace's knowledge or consent, and without paying anything to Candace.

59.    On or about February 26, 2020, Schiff consulted with Candace about a sculpture by Wangechi Mutu, *The Seated IV*, 2019, Bronze, 80 ½" x 36 ¾", that was available for purchase for $650,000 from the Gladstone Gallery in New York. At Schiff's request, Candace paid for the Mutu sculpture. Until Schiff's confession on May 8, 2023, Candace had no reason to doubt that Schiff / SFA had carried out Schiff's representation that Candace would purchase the sculpture and Schiff / SFA would use the payment received from Candace to pay Gladstone Gallery for the

15

Mutu sculpture. However, when Candace followed up with a Senior Partner at Gladstone Gallery, on May 8, 2023, he informed Candace that Schiff / SFA did not fully pay for the Mutu sculpture and that there was an outstanding balance of $252,000 owed on the Mutu sculpture.

60.    Through the ABC Action, Candace learned that Gladstone gave a discounted price for the sculpture, which Schiff / SFA did not tell Candace about or pass on to Candace. Instead, they had Candace pay the full undiscounted price, and apparently kept the ten percent discount amount ($65,000) for themselves (in addition to the unpaid $252,000 balance), or perhaps used it to pay for other works (for other customers).

61.    On or about March 13, 2020, Schiff consulted with Candace about a sculpture by Sarah Lucas, *CASANOVA*, 2018, Bronze, 44 1/8" x 35 7/8," that was available for purchase for $390,000 from the Gladstone Gallery in New York. Until Schiff's confession on May 8, 2023, Candace had no reason to doubt that Schiff / SFA had carried out Schiff's representation that Candace would purchase the sculpture and Schiff / SFA would use the payment received from Candace to pay Gladstone Gallery for the Sarah Lucas sculpture. However, when Candace followed up with a Senior Partner at Gladstone Gallery on May 8, 2023, she was informed that (although she had paid Schiff/SFA), Schiff / SFA never paid Gladstone Gallery for the Sarah Lucas sculpture.

62.    In or about September 2022, SFA/Schiff coordinated the sale from Candace to a family group of four works by Arthur Jafa, for a total of $750,000: (i) *Mickey Mouse was a Scorpio*; (ii) *Apex Grid*; (iii) *Apex* (film); and (iv) *Big Wheel II*. However, Candace never received the sale proceeds, which SFA's bank records (disclosed in the Barasch Parties' Action) show were deposited into SFA's account.

16

63.     On or about October 12, 2022, during the Frieze Art Fair in London, Schiff consulted with Candace about an artwork by Hayv Kahraman, *Torshi and eyes*, 2022, oil and torshi on linen, 50 x 50 inches, that was available for purchase for $48,000 from the Pilar Corrias Gallery in London, England. SFA invoiced Candace for the purchase of this work on January 9, 2023, for the total amount of $52,260 (consisting of the $48,000 price of the work, less a 10% ($4,800) discount from the gallery, plus a 10% commission ($4,800) to Schiff Fine Art, and tax of $4,260), all of which Candace paid. Until Schiff's confession on May 8, 2023, Candace had no reason to doubt that Schiff / SFA had carried out Schiff's representation that Candace would purchase the work and Schiff / SFA would use Candace's payment to pay Pilar Corrias Gallery for the Hayv Kahraman artwork. However, when Candace followed up with Pilar Corrias Gallery after speaking with Schiff on May 8, 2023, she was told that the Gallery had the work, and that Schiff / SFA never paid the Pilar Corrias Gallery for the painting.

64.     On November 7, 2022, Schiff consulted with Candace about an artwork by Alvaro Barrington, *Brazil*, 2021 mixed media on burlap in artist frame, 170 cm x170 cm x 5 cm, that was available for purchase for $150,000, plus taxes, fees, etc., for a total of $179,643.75, from the Sadie Coles Gallery in London, England. At Schiff's request, Candace and Michael made the payment for this Alvaro Barrington artwork to Schiff/SFA soon thereafter. Until Schiff's confession on May 8, 2023, Candace had no reason to doubt that Schiff / SFA had carried out Schiff's representation that Candace would purchase the work and Schiff / SFA would use the payment from Candace and Michael to pay Sadie Coles Gallery for the Alvaro Barrington artwork. However, when Candace followed up with Sadie Coles Gallery after speaking with Schiff on May 8, 2023, Sadie Coles Gallery informed Candace that Schiff / SFA never paid Sadie Coles Gallery for the painting.

65.     On or about November 22, 2022, prior to the Art Basel Miami Beach art fair, Schiff consulted with Candace about an artwork by Andrea Bowers, *Another Kind of Strength*, 2022, acrylic marker on cardboard, 66 cm x 25.4 cm, that was available for purchase for $32,100 plus VAT from the Kauffman Repetto Gallery in New York. At Schiff's request, Candace and Michael made payment for this Andrea Bowers artwork to Schiff/SFA soon thereafter. Until Schiff's confession on May 8, 2023, Candace had no reason to doubt that Schiff / SFA had carried out Schiff's representation that Candace would purchase the work and Schiff / SFA would use the payment from Candace and Michael to pay Kauffman Repetto Gallery for the Andrea Bowers artwork. However, when Candace followed up with Kauffman Repetto Gallery after speaking with Schiff on May 8, 2023, the Kauffman Repetto Gallery informed Candace via email on May 13, 2023 that Schiff / SFA never paid for the Andrea Bowers artwork, noting that Schiff had been invoiced on November 23, 2022, and when the Gallery followed up, Schiff told the Gallery multiple times to be more patient and that the payment would be made in a timely manner; however the payment never arrived.  Candace later learned that the Gallery sold the work to another party.

66.     In November 2022, Schiff consulted with Candace about a painting by Ernie Barnes, *Sandlot Football,* 1975, 17 7/8" x 36," that was available for purchase for $650,000 from Andrew Kreps Gallery. This was a secondary market purchase. At Schiff's request, the Barasch Parties sent a deposit of $50,000 for this Ernie Barnes painting to SFA's City National Bank account soon thereafter. The balance was to be paid from the Barasch Parties' proceeds of the Ghenie sale. Until Schiff's confession on May 8, 2023, Candace had no reason to doubt Schiff's representation that Schiff / SFA would and did purchase the work on Candace's behalf, using the $50,000 deposit and the Ghenie payment to pay the balance. While the $50,000 deposit was paid to Andrew Kreps Gallery for the purchase of the work, no further monies were paid toward the

18

balance. As a result, Andrew Kreps Gallery paid its consignor that $50,000 and cancelled the sale of the work to Candace, who lost that $50,000 deposit.

67.     On January 26, 2023, Schiff consulted with Candace about a painting by Harminder Judge, *Untitled (hair in hands)*, 2022, 95 15/16" x 45 ¼", mixed media on panel, that was available for purchase for from Pace Gallery. At Schiff's request, Candace wired the payment for this Harminder Judge artwork, totaling $45,090.58 ($37,650.00 for the work, $3,765 for SFA's 10% commission, and sales tax of $3,765.58) from the Trust account to SFA's City National Bank account soon thereafter. Apparently, Schiff used Candace's funds to pay Pace Gallery for the Harminder Judge artwork but never arranged for the Judge artwork to be delivered to Candace. Candace followed up with Pace Gallery which is now unable to release Candace's Harminder Judge artwork to her. As the Gallery explained to Candace, because the invoice for the Harminder Judge artwork was put in the name of SFA, Pace would need Schiff's consent and full release in order to deliver the work to Candace.

68.     On or about February 2, 2023, Schiff consulted with Candace about a painting by Louis Hammond, *False Flag,* 2023, oil on linen, 11 ¾" x 9 7/8" x 1," that was available for purchase for $11,976.25 ($11,000 less a ten percent discount of $1,100, plus a ten percent commission of $1,100 to SFA, and sales tax of $976.25) from 47 Canal Gallery in New York. At Schiff's request, Candace wired the payment for this Louis Hammond artwork to Schiff Fine Art's City National Bank account soon thereafter. Until Schiff's confession on May 8, 2023, Candace had no reason to doubt that Schiff / SFA had carried out Schiff's representation that Candace would purchase the work and Schiff / SFA would use the payment wired by Candace to pay 47 Canal Gallery for the Louis Hammond artwork. However, when Candace followed up with 47 Canal

Gallery after speaking with Schiff on May 8, 2023, 47 Canal Gallery informed Candace that Schiff / SFA never paid 47 Canal Gallery for the Louis Hammond painting.

69.    On February 6, 2023, Schiff consulted with Candace about an artwork by Lauren Halsey, *RIMS "N" THANGS*, 2023, vinyl, steel tube with aluminum cladding, custom paint, LED and power supply, 120" x 45" x 30", that was available for purchase for $110,000 (including SFA's 10% commission) from the David Kordansky Gallery in New York. At Schiff's request, Candace wired a significant partial payment (approximately $50,000) for this Lauren Halsey artwork to Schiff Fine Art's City National Bank account soon thereafter. Schiff texted Candace on May 1st requesting another payment of $76,645 plus tax for this artwork. Until Schiff's confession on May 8, 2023, Candace had no reason to doubt that Schiff / SFA had carried out Schiff's representation that Candace would purchase the work and Schiff / SFA would use the payment wired by Candace to pay David Kordansky Gallery for the Lauren Halsey artwork. However, when Candace followed up with David Kordansky Gallery after speaking with Schiff on May 8, 2023, David Kordansky Gallery informed Candace that Schiff / SFA did not pay the Gallery any money for the work. However, the Gallery agreed to sell the work to Candace for the amount of the remaining balance, and to forego the $50,000 deposit.

70.    On or about February 28, 2023, Schiff consulted with Candace about two artworks by Hadi Falapishi that were available for purchase from Andrew Kreps Gallery in New York: (1) *Self Portrait*, 2023, mixed media on panel, 84" x 54," for $45,000 and (2) *Praying Man*, 2023, glazed ceramic, 18" x 16," for $25,000. At Schiff's request, Candace and Michael remitted the $70,000 payment for these two Hadi Falapishi artworks to SFA soon thereafter. Until Schiff's confession on May 8, 2023, Candace had no reason to doubt that Schiff / SFA had carried out Schiff's representation that Candace would purchase the works and Schiff / SFA would use the

payment wired by Candace and Michael to pay Andrew Kreps Gallery for the Hadi Falapishi artworks. However, when Candace followed up with Andrew Kreps Gallery after speaking with Schiff on May 8, 2023, Andrew Kreps Gallery informed Candace that Schiff / SFA never paid for the Hadi Falapishi artworks.

71.    On March 21, 2023, Schiff consulted with Candace about an artwork by Mindy Shapero, *Portal scar, Don't wait for the buy in*, 2023, Acrylic, gold and silver leaf on linen, 90" x 72," that was available for purchase for $80,000 from Nino Mier Gallery in Los Angeles. At Schiff's request, Candace wired the payment for this Mindy Shapero artwork from the Trust account to SFA's City National Bank account soon thereafter. Until Schiff's confession on May 8, 2023, Candace had no reason to doubt that Schiff / SFA had carried out Schiff's representation that the Trust would purchase the work and Schiff / SFA would use the payment wired by Candace to pay Nino Mier Gallery for the Mindy Shapero artwork. However, when Candace followed up with Nino Mier after speaking with Schiff on May 8, 2023, Nino Mier informed Candace that Schiff / SFA never paid Nino Mier Gallery for the painting.

72.    In March 2023, Schiff consulted with Candace about co-investing in four paintings by Adrian Berg that were available for purchase for $25,000 each, for a total of $100,000, plus tax, from Frestonian Gallery in London: (1) *Kew 20th August*, oil on canvas, 30 1/8 x 36 1/8 inches (1997); (2) *Glyndebourne III*, oil on canvas, 24x 36 inches (1990); (3) *Beachy Head 7th September*, oil on canvas, 25 x 35 1/8 inches (1994); and (4) *Gloucester Gate, Regent's Park, October*, oil on canvas, 32 x 32 inches (1983). Half-shares in each of the four works were $12,500, for a total of $50,000. Candace agreed to purchase 50% of the four works, with Schiff owning the remaining half-shares. At Schiff's request, Candace remitted payment of $50,000 plus tax of $4,437.50, totaling $54,437.50, to SFA soon thereafter. Until Schiff's confession on May 8, 2023, Candace

21

had no reason to doubt that Schiff / SFA had carried out Schiff's representation that Candace would purchase half-shares in the Berg works and Schiff / SFA would use the payment wired by Candace to pay for 50% of the four paintings to Frestonian Gallery. The Frestonian Gallery informed Candace that the four paintings were shipped to SFA, and per Schedule A/B of SFA's Schedules and Liabilities, it appears that the four paintings are in possession of SFA's chapter 7 trustee.

73.     In April 2023, Schiff consulted with Candace about a painting by Anicka Yi, *Kn£M§†R, 2023*, acrylic, UV print on aluminum 67 ¼" x 55 ¼," which was available for purchase from 47 Canal Gallery in New York for $175,000, less a ten percent discount of $17,500. At Schiff's request, Candace wired $190,531.25 from the Trust to SFA's City National Bank account soon thereafter. Until Schiff's confession on May 8, 2023, Candace had no reason to doubt that Schiff / SFA had carried out Schiff's representation that the Trust would purchase the Yi work and Schiff / SFA would use the payment wired by Candace to pay 47 Canal Gallery for the Anicka Yi artwork. However, when Candace followed up with 47 Canal Gallery after speaking with Schiff on May 8, 2023, 47 Canal Gallery informed Candace that Schiff / SFA never paid 47 Canal Gallery for the Anicka Yi artwork.

74.     Additionally, in June 2019 Candace purchased through SFA, from the Victoria Miro Gallery in London, a painting by Yayoi Kusama titled *The Sun Rises* (2018), acrylic on canvas, 76 3/8" x 76 3/8."  The total purchase price was $807,500 (comprising the price of $850,000 less a five percent (5%) discount of $42,500), plus an $85,000 commission to SFA, which Candace paid in full and which Schiff acknowledged; Candace subsequently added this work to her fine art insurance policy.  Unknown to Candace, however, SFA left a balance of $151,888.89 due to the Victoria Miro Gallery.  Because of the outstanding balance for the artwork that SFA failed to remit, the artwork was not transferred to Candace and remains with the Gallery.

75.    Candace also paid for other artworks that Schiff apparently held onto in her and/or SFA's art storage facility(s) rather than in a facility where Candace's artworks were stored, and which now are apparently being held by the SFA chapter 7 trustee or her designee(s), including without limitation Phillips Auctioneers. Those works include: (i) a Roberto Gil de Montes painting, *Chino* (2021), which Candace purchased and has long been paid in full; (ii) a James Nares painting, *Untitled (Yellow)* (2002)*,* which Candace purchased and has long been paid for in full; (iii) a Fredrik Vaerslev painting, *Untitled (Drobak Kunstforening #11)* (2013), which Candace acquired in 2013 and paid for in full; (iv) a painting by Soimadou Ibrahim, *For Life is Not Eternal* (2021), 71" x 71", which is co-owned by Candace and Schiff, and for which Candace paid her 50% share in full.   None of these four works are listed Schiff's or SFA's schedules in the Chapter 7 proceedings, and Schiff's counsel has acknowledged in the Chapter 7 proceedings that the Roberto Gil de Montes and Vaerslev paintings belong to Candace and has disclaimed any knowledge of the Nares painting.

76.    Candace also paid SFA in full for the purchase of Cory Arcangel's *TOPLINE,* which is a room-size installation consisting of 14 large scanner paintings, a custom rug and two custom benches, from Thaddaeus Ropac Gallery in London.  Based on Candace's understanding that SFA / Schiff had remitted full payment for the Arcangel works as of September 2021, in accordance with the Thaddaeus Ropac terms and Candace's instructions, and using funds Candace entrusted to Schiff / SFA for that purpose, Candace formally added the Cory Arcangel works to her insurance policy in November 2021.  Following Schiff's May 8, 2023 confession of theft, Candace learned that between March 10, 2021 and September 26, 2022, SFA / Schiff made payments to Thaddaeus Ropac Gallery for *TOPLINE* amounting to $575,000, leaving a balance due to the Gallery of $175,000.  The Gallery and the artist ultimately agreed with Candace to

accept the $575,000 in payments received from SFA as payment in full by Candace. However, as a result of Schiff's commencement of the ABC Action and the Chapter 7 proceedings, the works remain with the Thaddaeus Ropac Gallery.

77.     The Barasch Parties have transferred millions of dollars to SFA for what they believed were purchases of artwork. It now appears that much of the funds that Schiff / SFA requested and the Barasch Parties provided for artwork purchases, and the proceeds of SFA's sales of certain of the Barasch Parties' artworks, were used instead to fund Schiff's lavish lifestyle, cover debts Schiff / SFA owed to other clients, or to consummate art purchases for other clients of Schiff / SFA.

78.     Since Schiff admitted her wrongful conduct to Candace, the Barasch Parties have learned that Schiff was trying to gather and sell as many assets as possible. Among other things, Candace learned that Schiff contacted at least two galleries (including Journal Gallery on or about May 3, 2023, and Kordansky Gallery on May 10, 2023) and one artist, trying to get possession of artworks (which presumably could be sold or transferred out of the country).

79.     The artworks that Schiff tried to obtain from Journal Gallery included two Chloe Wise paintings that Candace had committed to buy for $158,957.50, with proceeds from the Ghenie sale (which proceeds were not remitted in full to the Barasch Parties and Grossman (the co-owner of the Ghenie)).

80.     In addition, the Barasch Parties have learned that Schiff has reached out to several jewelers to try to sell back thousands of dollars in jewelry that Schiff bought from them.

**D.      Schiff and SFA's Relationship with Grossman**

81.     Grossman's spouse met Schiff nearly twenty years ago, in or about 2004 or 2005. While Grossman's spouse initially just had a business relationship with Schiff and her entities,

Grossman and his spouse subsequently developed a deep personal friendship with Schiff, attending the bris of her son and acting as "adjunct parents" to him, for instance attending Father's Day events at his school, and traveling together with Schiff and her son.

82.    In their business and personal dealings since they met, Schiff presented herself to Grossman and his spouse as an ethical, sophisticated, knowledgeable, and financially successful businesswoman, and gave no hint to either of them that she or her business were in financial distress, or that any of the business dealings in which Schiff / SFA engaged were other than aboveboard. Nor did any of Schiff's / SFA's employees, including without limitation SFA's London advisor and director, and Schiff's / SFA's independent accountant in New York, give Grossman or his spouse any indication that Schiff and/or SFA were in any financial distress.

E.    **Candace's and Grossman's Purchase of Ghenie's *The Uncle 3*, through Schiff/SFA**

83.    In or about April 2021, Schiff brought to Candace's attention a 2019 painting by artist Adrian Ghenie entitled *The Uncle 3*, which was available for purchase.

84.    After discussions among Candace, Grossman and Grossman's spouse, Candace, Grossman, and Grossman's spouse agreed to purchase the Ghenie Artwork together, with Candace acquiring a fifty percent share, and Grossman and his spouse each acquiring a twenty-five percent interest in the Ghenie Artwork.

85.    Candace's purchase of her share of the Ghenie Artwork was completed in or about February 2021, under SFA's invoice, with Candace remitting half of the purchase price through SFA's bank account at City National Bank.

86.    Grossman's and his spouse's purchase of their share of the Ghenie Artwork was completed in or about April 2021, under SFA's invoice, with Grossman's spouse wiring half of the purchase price through SFA's bank account at City National Bank.

87.     Upon completion of the sale, the Ghenie Artwork was not delivered to any of Grossman and / or Candace individually. Instead, it was supposed to have been sent from storage at Crozier Fine Arts to Candace's art storage unit at Uovo in Delaware. However, instead of sending the Ghenie Artwork to Uovo, Schiff caused the Ghenie Artwork to be sent to Maquette Fine Art's storage facility in Delaware, with Candace and Grossman bearing the pro rata costs of packing and shipping the Ghenie Artwork.

88.     While upon information and belief the Ghenie Artwork was placed in a storage unit in Candace's name, on a day-to-day basis Schiff controlled the storage unit and what was in it.

**F.     Schiff through SFA brokered the sale of the Ghenie Artwork on Candace's and Grossman's Behalf, but Failed to Remit Payment to Candace and Grossman, and Admitted Wrongdoing**

89.     In early to mid-November 2022, Candace and Grossman entered into an oral agreement with Schiff pursuant to which Schiff and SFA undertook to broker the sale of the Ghenie Artwork and distribute the sale proceeds *pro rata* to Candace and Grossman, less Schiff / SFA's commission of 10% of the purchase price.

90.     Pursuant to this oral agreement, Schiff / SFA brokered the sale of the Ghenie Artwork on behalf of Candace and Grossman through Sotheby's Hong Kong in or about December 2022. The Ghenie Artwork was sold for approximately $2.5 million. The Ghenie Artwork was delivered to Sotheby's, 1334 York Avenue, New York, New York 10021, on December 5, 2022 in accordance with the instructions of SFA.

91.     On or about January 18, 2023, $225,000 of the sale proceeds were wired from SFA's account at City National Bank to Grossman's spouse, who then transferred half ($112,500) to Grossman.

26

92.     Also on or about January 18, 2023, upon information and belief, Schiff/SFA credited $225,000 of the sale proceeds to Candace, for other artwork purchases.

93.     Upon information and belief, on or before January 18, 2023 Schiff / SFA took a sales commission of $250,000 from the sale proceeds of the Ghenie Artwork (10% net of the $2.5 million sale price).

94.     Sotheby's confirmed that the Ghenie Artwork was sold. Schiff, promised to disburse the remaining $1.8 million to Candace, Grossman and Grossman's spouse ($900,000 to Barasch, $450,000 to Grossman and $450,000 Grossman's spouse) on March 26, 2023. Prior to March 26 however, Schiff requested an additional thirty days to make the payment, asserting the delay was an accommodation to the purchasers in Hong Kong, but assuring Candace and Schiff that the purchasers were not backing out of the sale, and guaranteeing that the $1.8 million payment would be made.

95.     On Monday, April 10, 2023, Schiff texted Grossman's spouse, "Just checked in on [G]henie payment! . . . [¶] What else can we work on?" Neither plaintiff Grossman nor his spouse entered into any other business transactions with Schiff / SFA.

96.     However, yet again, a few days before the April 26, 2023 payment of $1,800,000 was due, Schiff contacted Candace and Grossman stating that the purchasers of the Artwork needed at least another two weeks to make the $1,800,000 payment that was originally due on March 26. On April 23, 2023, Schiff texted Grossman's spouse:

> Ok so . . . they are trying but can't guarantee. Buyer is also trying. No one is worried. So trying for 2 weeks but could be 1 month and no longer – guaranteed. It was always only one delay I just refused to accept more than one month. And if possible will send smaller increments in the meantime. I am pushing for at least more funds no matter what as proof that not backing out. This seems maybe doable.

97.     Again, Schiff reassured Candace and Grossman that the payment would be made and that the purchasers were not backing out of the deal.

98.     On or about May 5, 2023, Grossman texted Schiff to confirm that his and his spouse's $450,000 payments would be forthcoming on Monday, May 8, 2023. As Grossman and his spouse had informed Schiff, these proceeds were intended and necessary for the support of Grossman's elderly in-laws, specifically for the cost of moving them from the hospital into an assisted living facility. Schiff confirmed to Candace and Grossman via text to Grossman that Schiff / SFA were "working on it…."

99.     On Sunday, May 7, 2023, Schiff emailed Grossman's spouse two lengthy decks of artworks available for purchase at the upcoming TEFAF and Independent New York art fairs, including multimillion-dollar works by various artists.

100.    Despite repeated demands by Candace and Grossman for payment of the Ghenie Artwork sale proceeds, Schiff refused to disburse the Ghenie Artwork sale proceeds.

101.    On May 8, 2023, Schiff conceded to Candace and Grossman that the money owed to them from the sale of the Ghenie Artwork was gone. That day, Grossman's spouse met with Schiff in person and asked about the payments due on the Ghenie Artwork. For the first time, Schiff told him she did not have the money, and to call her attorney – and then walked away from him. Grossman's spouse texted, attempting to relay this message to Candace, "She just said she doesn't have our money and then she asked me to call her lawyer and then walked away." The message went to Schiff, who responded, acknowledging her wrongdoing:

Did you call him

I am sorry and have every intention to make things right

It's just complicated I know you will never speak to me again but I will try to make it right regardless

28

102.    In fact, documents obtained in discovery in the Ghenie Action and the Barasch Parties' Action reveal that the entire amount of the sale proceeds of the Ghenie Artwork was deposited in SFA's account at City National Bank by January 17, 2023:  $810,000 on December 16, 2022, and $1,690,000 on January 17, 2023.  Schiff's stories about the purchasers in Hong Kong requesting payment terms and needing additional time to pay were deliberate lies, to lull Plaintiffs into a sense of security about the delayed payments, while Schiff took their money for herself and/or for other clients' obligations.

G.      **Schiff Stole Nearly $250,000 that Geller Paid for a Painting**

103.    In or about March 2023, Schiff consulted with Geller regarding a painting by Katharina Grosse, *Untitled* (2022), acrylic on canvas, 58 ¼" x 47 5/8", which was available for purchase from Galerie Max Hetzler in Berlin, Germany, for $233,275, less a special discount of $27,125, plus a ten percent commission of $23,327.50 to SFA and sales tax of $20,366.13, for a total of $249,843.63.  At Schiff's request, Geller wired $249,843.63 to SFA's City National Bank account on or about March 27, 2023, and had no reason to doubt that Schiff / SFA would use the payment wired by Geller to pay Galerie Max Hetzler for the Katharina Grosse painting.

104.    However, Geller subsequently learned from Schiff's counsel in or about May or early June 2023, and from Max Hetzler, that Schiff/SFA never paid for the Katharina Grosse painting (for which the Galerie had invoiced SFA in the amount of €215,000, less a discount of €25,000, for a total of €190,000).  Upon learning this, Geller dealt directly with Galerie Max Hetzler to purchase the painting – essentially paying twice for the same artwork as a result of Schiff keeping Geller's original payment of $249,843.63, for her own and/or SFA's benefit.

105.    In her business dealings with Geller, Schiff presented herself to Geller as an ethical, sophisticated, knowledgeable, and financially successful businesswoman, and gave no hint to

Geller that she or her business were in financial distress, or that any of the business dealings in which Schiff / SFA engaged were other than aboveboard. Nor did any of Schiff's / SFA's employees, including without limitation SFA's London advisor and director, give Geller any indication that Schiff and/or SFA were in any financial distress.

**H.**   **Schiff through SFA Failed to Pay Hangman for Its Services**

106.    Hangman provides logistics services to clients, including transportation of works of fine art.  In February 2023 and March 2023, Schiff through SFA engaged Hangman to transport several works of art between Brooklyn and Manhattan, NY, and from New York, NY to southern California.  Hangman's services were provided to Schiff/SFA with the agreement and expectation that Schiff/SFA would pay for those services as invoiced.

107.    Hangman submitted its invoices to SFA in February 2023 and March 2023, but received no payment from Schiff or SFA.  The total amount due for the transportation services provided by Hangman, and related credit card fees and late fees, is $2,298.19.  However, neither Schiff nor SFA ever paid Hangman's invoices.

108.    In her business dealings with Hangman, Schiff presented herself to Hangman as an ethical, sophisticated, knowledgeable, and financially successful businesswoman, and gave no hint to Hangman that she or her business were in financial distress, or that any of the business dealings in which Schiff / SFA engaged were other than aboveboard. Nor did any of Schiff's / SFA's employees give Hangman any indication that Schiff and/or SFA were in any financial distress.

## **COUNT ONE (DECLARATORY JUDGMENT THAT PLAINTIFFS' CLAIMS ARE NONDISCHARGEABLE UNDER 11 U.S.C. § 523(a)(2)(A))**

109.    Plaintiffs repeat and reallege paragraphs 1 through 108 hereof, as if fully set forth herein.

110.    Plaintiffs seek an order pursuant to section 105(a) of the Bankruptcy Code declaring that Plaintiffs' claims against the Debtor of over $6,650,000 are nondischargeable pursuant to section 523(a)(2)(A) of the Bankruptcy Code.

111.    Bankruptcy Code section 523(a)(2)(A) provides in pertinent part as follows:

(a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—
(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—
(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition

112.    As set forth in abundant detail above, Schiff engaged in a massive fraud, stealing monies and services from Plaintiffs to fund her lavish lifestyle.

113.    Schiff  made various representations to the Barasch Parties that she was paying the galleries in full from the monies provided by the Barasch Parties for purchases of artworks and from the sale proceeds of artworks owned by the Barasch Parties.   It was only after Schiff's May 8, 2023 admission of her fraud to Plaintiffs that the Barasch Parties learned that Schiff did not use their funds to purchase artworks as they had directed, but instead kept and converted the Barasch Parties' funds for her own and/or SFA's benefit.

114.    Indeed, Schiff accepted funds which the Barasch Parties entrusted to her for the purchase of artworks, under false pretenses and representations that Schiff was going to use the Barasch Parties' monies towards their purchase of artworks.  Instead of doing so and paying the

galleries selling the artworks, Schiff made partial payments, or none at all, and kept the Barasch Parties' funds for her own and/or SFA's benefit.

115.    Additionally, Schiff failed to remit funds owed to the Barasch Parties and Grossman from her/SFA's sales of artworks on their behalf, including without limitation the Ghenie Artwork owned by the Barasch Parties and Grossman, the four Arthur Jafa works owned by the Barasch Parties, and the Nicholas Party Cat owned by the Barasch Parties. Schiff through SFA sold these works, but and instead of remitting the full sale proceeds to the Barasch Parties and Grossman, she stole and kept the Barasch Parties' and Grossman's funds for her own and/or SFA's benefit.

116.    Similarly, Schiff accepted funds which Geller entrusted to her for the purchase of the Katharina Grosse painting, under false pretenses and representations that Schiff was going to use Geller's monies towards the purchase of the painting. Instead of doing so and paying the Galerie Max Hetzler, Schiff made no payment to the Galerie, and kept Geller's funds for her own and/or SFA's benefit.

117.    Likewise, Schiff for SFA accepted the transportation services provided by Hangman, under false pretenses and representations that Schiff agreed to and would pay Hangman for its services. Instead of doing so, Schiff and SFA accepted Hangman's services but failed to make any payment to Hangman.

118.    Schiff's behavior described herein constitutes actual fraud so as to preclude a Chapter 7 discharge pursuant to Bankruptcy Code section 523(a)(2)(A).

## COUNT TWO (DECLARATORY JUDGMENT THAT PLAINTIFFS' CLAIMS ARE NONDISCHARGEABLE UNDER 11 U.S.C. § 523(a)(4))

119.    Plaintiffs repeat and reallege paragraphs 1 through 118 hereof, as if fully set forth herein.

120.    Plaintiffs seek an order pursuant to section 105(a) of the Bankruptcy Code declaring that Plaintiffs' claims against the Debtor of over $6,650,000 are nondischargeable pursuant to section 523(a)(4) of the Bankruptcy Code.

121.    Bankruptcy Code section 523(a)(4) provides in pertinent part as follows:

> (a) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—
> (4) for fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny;

122.    As set forth in detail above, Schiff acted as an art advisor to the Barasch Parties, Grossman and Geller, and as an advisor and/or agent in the transactions described herein, she owed fiduciary duties to Plaintiffs.

123.    Schiff violated her fiduciary duties to Plaintiffs by her fraud and / or defalcation described herein.  Indeed, Schiff willfully created a scheme to steal from Plaintiffs to fund her extravagant lifestyle and to benefit SFA and her other clients, all at Plaintiffs' expense and to their detriment.

124.    As set forth in abundant detail above, Schiff engaged in a massive fraud, stealing monies from Plaintiffs to fund her lavish lifestyle and to benefit her other clients, all at Plaintiffs' expense and to their detriment.

125.    Schiff  made various representations to the Barasch Parties that she was using the funds they entrusted to her to pay the galleries in full for purchases of artworks as they directed. Instead of doing so, Schiff made partial payments, or none at all, to the galleries, and kept the Barasch Parties' funds for her own and/or SFA's benefit.

126.    Additionally, Schiff failed to remit funds owed to the Barasch Parties and Grossman from her/SFA's sales of artworks on their behalf, including without limitation the Ghenie Artwork owned by the Barasch Parties and Grossman, the four Arthur Jafa works owned by the Barasch

33

Parties, and the Nicholas Party Cat owned by the Barasch Parties. Schiff through SFA sold these works, but and instead of remitting the full sale proceeds to the Barasch Parties and Grossman, she stole and kept their funds for her own and/or SFA's benefit.

127. Similarly, Schiff accepted funds which Geller entrusted to her for the purchase of the Katharina Grosse painting, under false pretenses and representations that Schiff was going to use Geller's monies towards the purchase of the painting. Instead of doing so and paying the Galerie Max Hetzler, Schiff made no payment to the Galerie, and kept Geller's funds for her own and/or SFA's benefit.

128. Likewise, Schiff for SFA accepted the transportation services provided by Hangman, under false pretenses and representations that Schiff agreed to and would pay Hangman for its services. Instead of doing so, Schiff and SFA accepted Hangman's services but failed to make any payment to Hangman.

129. Schiff's behavior described herein constitutes fraud and / or defalcation, and as such, precludes a Chapter 7 discharge pursuant to Bankruptcy Code section 523(a)(4).

## COUNT THREE (DECLARATORY JUDGMENT THAT PLAINTIFFS' CLAIMS ARE NONDISCHARGEABLE UNDER 11 U.S.C. § 523(a)(6))

130. Plaintiffs repeat and reallege paragraphs 1 through 129 hereof, as if fully set forth herein.

131. Plaintiffs seek an order pursuant to section 105(a) of the Bankruptcy Code declaring that Plaintiffs' claims against the Debtor of over $6,650,000 are nondischargeable pursuant to section 523(a)(6) of the Bankruptcy Code.

132. Bankruptcy Code section 523(a)(6) provides in pertinent part as follows:

> (b) A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—

34

(6) for willful and malicious injury by the debtor to another entity or to the property of another entity;

133.    As set forth in detail above, Schiff's theft, false representations and fraudulent conduct toward Plaintiffs were willful and malicious.  Indeed, Schiff willfully created a scheme to steal from Plaintiffs to fund her extravagant lifestyle and to benefit herself and SFA.

134.    As set forth in abundant detail above, Schiff engaged in a massive fraud, stealing monies and services from Plaintiffs to fund her lavish lifestyle and to benefit herself, SFA and her other clients, all at Plaintiffs' expense and to their detriment..

135.    Schiff  made various representations to the Barasch Parties that she was paying the galleries in full from the monies provided by the Barasch Parties for purchases of artworks and from the sale proceeds of artworks owned by the Barasch Parties.   It was only after Schiff's May 8, 2023 admission of her fraud to Plaintiffs that the Barasch Parties learned that Schiff did not use their funds to purchase artworks as they had directed, but instead kept and converted the Barasch Parties' funds for her own and/or SFA's benefit.

136.    Indeed, Schiff accepted funds which the Barasch Parties entrusted to her for the purchase of artworks, under false pretenses and representations that Schiff was going to use the Barasch Parties' monies towards their purchase of artworks.  Instead of doing so and paying the galleries selling the artworks, Schiff made partial payments, or none at all, and kept the Barasch Parties' funds for her own and/or SFA's benefit.

137.    Additionally, Schiff failed to remit funds owed to the Barasch Parties and Grossman from her/SFA's sales of artworks on their behalf, including without limitation the Ghenie Artwork owned by the Barasch Parties and Grossman, the four Arthur Jafa works owned by the Barasch Parties, and the Nicholas Party Cat owned by the Barasch Parties.  Schiff through SFA sold these

works, but and instead of remitting the full sale proceeds to Plaintiffs, she stole and kept the Barasch Parties' and Grossman's funds for her own and/or SFA's benefit.

138.    Similarly, Schiff accepted funds which Geller entrusted to her for the purchase of the Katharina Grosse painting, under false pretenses and representations that Schiff was going to use Geller's monies towards the purchase of the painting.  Instead of doing so and paying the Galerie Max Hetzler, Schiff made no payment to the Galerie, and kept Geller's funds for her own and/or SFA's benefit.

139.    Likewise, Schiff for SFA accepted the transportation services provided by Hangman, under false pretenses and representations that Schiff agreed to and would pay Hangman for its services.  Instead of doing so, Schiff and SFA accepted Hangman's services but failed to make any payment to Hangman.

140.    Schiff's behavior described herein constitutes willful and malicious acts which significantly harmed Plaintiffs, so as to preclude a Chapter 7 discharge pursuant to Bankruptcy Code section 523(a)(6).

### COUNT FOUR (DECLARATORY JUDGMENT THAT PLAINTIFFS' CLAIMS ARE NONDISCHARGEABLE UNDER 11 U.S.C. § 727(a)(2)(A)

141.    Plaintiffs repeat and reallege paragraphs 1 through 140 hereof, as if fully set forth herein.

142.    Plaintiffs seek an order pursuant to section 105(a) of the Bankruptcy Code declaring that Plaintiffs' claims against the Debtor of over $6,650,000 are nondischargeable pursuant to section 727(a)(2)(A) of the Bankruptcy Code.

143.    Bankruptcy Code section 727(a)(2)(A) provides in pertinent part as follows:

> (a) The court shall grant the debtor a discharge, unless—
> (2) the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title,

has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed—

(A) property of the debtor, within one year before the date of the filing of the petition

144.    As set forth in detail above, within the one year prior to Schiff's filing of her Chapter 7 case, Schiff defrauded Plaintiffs.

145.    As set forth in abundant detail above, Schiff engaged in a massive fraud, stealing monies from Plaintiffs to fund her lavish lifestyle.

146.    Schiff  made various representations to the Barasch Parties that she was paying the galleries in full from the monies provided by the Barasch Parties for purchases of artworks and from the sale proceeds of artworks owned by the Barasch Parties.   It was only after Schiff's May 8, 2023 admission of her fraud to Plaintiffs that the Barasch Parties learned that Schiff did not use their funds to purchase artworks as they had directed, but instead kept and converted the Barasch Parties' funds for her own and/or SFA's benefit.

147.    Indeed, Schiff accepted funds which the Barasch Parties entrusted to her for the purchase of artworks, under false pretenses and representations that Schiff was going to use the Barasch Parties' monies towards their purchase of artworks.  Instead of doing so and paying the galleries selling the artworks, Schiff made partial payments, or none at all, and kept the Barasch Parties' funds for her own and/or SFA's benefit.

148.    Additionally, Schiff failed to remit funds owed to the Barasch Parties and Grossman from her/SFA's sales of artworks on their behalf, including without limitation the Ghenie Artwork owned by the Barasch Parties and Grossman, the four Arthur Jafa works owned by the Barasch Parties, and the Nicholas Party Cat owned by the Barasch Parties.  Schiff through SFA sold these

works, but and instead of remitting the full sale proceeds to the Barasch Parties and Grossman, she stole and kept their funds for her own and/or SFA's benefit.

149.    Similarly, Schiff accepted funds which Geller entrusted to her for the purchase of the Katharina Grosse painting, under false pretenses and representations that Schiff was going to use Geller's monies towards the purchase of the painting.  Instead of doing so and paying the Galerie Max Hetzler, Schiff made no payment to the Galerie, and kept Geller's funds for her own and/or SFA's benefit.

150.    Likewise, Schiff for SFA accepted the transportation services provided by Hangman, under false pretenses and representations that Schiff agreed to and would pay Hangman for its services.  Instead of doing so, Schiff and SFA accepted Hangman's services but failed to make any payment to Hangman

151.    Schiff's behavior described herein constitutes actual fraud so as to preclude a Chapter 7 discharge pursuant to Bankruptcy Code section 727(a)(2)(A).

*[remainder of page intentionally left blank]*

**WHEREFORE**, Plaintiffs demand judgment against Defendant Schiff for an order declaring Plaintiffs' claims against Schiff to be non-dischargeable pursuant to sections 523(a)(2)(A), 523(a)(4), 523(a)(6), and 727(a)(2)(A) of the Bankruptcy Code.

Dated: October 15, 2024

Respectfully submitted,

**A.Y. STRAUSS LLC**

By: */s/ Eric H. Horn*  
Eric H. Horn  
Maria A.G. Harper  
290 West Mount Pleasant Avenue, Suite 3260  
Livingston, New Jersey 07039  
Tel: 973-287-0966  
Fax: 973 -533-0127

-and-

Wendy J. Lindstrom  
Laura D. Castner  
**MAZZOLA LINDSTROM LLP**  
1350 Avenue of the Americas, 2nd Floor  
New York, New York 10019  
Tel: 646-216-8300

*Counsel for the Plaintiffs*